IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

*v.*

CARLA JACKSON

Criminal Action No.

1:20-CR-296-5-JPB

### United States' Sentencing Memorandum

The United States of America, by Ryan K. Buchanan, United States Attorney for the Northern District of Georgia, and Tal C. Chaiken and Samir Kaushal, Assistant United States Attorneys, and by Glenn S. Leon, Chief of the Fraud Section, and Siji Moore, Trial Attorney, respectfully files this Sentencing Memorandum in advance of Defendant Carla Jackson's sentencing, which is set for May 16, 2024 at 1:00 p.m.  After a nearly two-week trial with co-defendant Teldrin Foster, a jury convicted Jackson of two counts of concealment money laundering in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i). Jackson asks the Court to impose a sentence of probation, home detention, or "minimal custody time," relying heavily on her history and characteristics as a law-abiding, professional woman.  (*See generally* DE 987.)  Her arguments, however, are largely foreclosed by Eleventh Circuit precedent.  As set forth below, the United States submits that a within-Guidelines sentence of imprisonment is necessary to comply with the purposes set forth in Title 18, United States Code, Section 3553(a).

## I.   Unresolved Guidelines Issues[1]

### A.   Jackson Was Not a Minor Participant in the Conduct for Which She is Held Accountable.

Jackson asks the Court to compare her role to that of "the group of twenty codefendants" and to determine that she played a minimal role in the offense. (DE 987 at 13.)  Her argument is fundamentally flawed because it misapplies the law.  Jackson cannot meet her burden of proving that she played a mitigating role in her own laundering of funds.  *See United States v. Martin*, 803 F.3d 581, 591 (11th Cir. 2015) ("The defendant, as the proponent of the downward adjustment under § 3B1.2, bears the burden of proving her mitigating role in the offense by a preponderance of the evidence.").

Two principles inform the determination of a defendant's role in the offense: (1) the defendant's role in the relevant conduct for which she is held accountable at sentencing; and (2) the defendant's role as compared to other participants' roles in that relevant conduct.  *See United States v. Rodriguez De Varon*, 175 F.3d 930, 940 (11th Cir. 1999) (*en banc*).  Even if a defendant played a lesser role than other participants, that does not automatically "entitle her to a role reduction 'since it is possible that none are minor or minimal participants.'" *Martin*, 803 F.3d at 591 (citation omitted); *United States v. Zaccardi*, 924 F.2d 201, 203 (11th Cir. 1991) (that the defendant may be the least culpable among named defendants does not establish that he performed a minor role in the conspiracy).

---

[1] Jackson's Memorandum is titled as a motion for a "downward variance and downward departure."  (DE 987 at 1.)  Because Jackson does not identify any grounds for a downward departure, the Court should deny such departure.

The Eleventh Circuit has held that where a defendant is convicted of money laundering, the district court may base a role adjustment only on the defendant's role as to the money laundering offense itself, not the underlying offense that generated the laundered proceeds. *See United States v. Salgado*, 745 F.3d 1135, 1138 (11th Cir. 2014). In other words, "for purposes of § 2S1.1(a)(1), a defendant's relevant conduct for Chapter Three adjustments is limited to his part in the money laundering offense." *Id.* at 1140. For example, in *Salgado*, the Eleventh Circuit reversed the district court's application of a role enhancement where the district court calculated the defendant's Guidelines under Section 2S1.1(a)(1) but considered the defendant's role in the underlying drug conspiracy, rather than solely as to the money laundering offense. *Id.* at 1138–40.

Here, Jackson has been held accountable only for the amount of the laundered funds actually deposited into her bank account. (PSR, ¶¶ 79, 81–82, 95.) Thus, under *Rodriguez De Varon* and *Salgado*, her role in the offense can be determined only by comparing her role to that of other participants in *that* relevant conduct. Though Jackson recognizes the applicable legal principles, she nevertheless mistakenly urges the Court to find that she played a minimal role "in the underlying conduct in the group of twenty defendants." (DE 987 at 13; *see also id.* at 14 (arguing that Jackson's role was minimal "in relation to John Gaines' and Andre Gaines' roles, and in relation to the roles of the remaining seventeen codefendants").) The only other participant in the offenses for which Jackson was held accountable – concealment money laundering – is John Gaines, and the Court therefore cannot compare Jackson's role to anyone other than John

Gaines.[2]  *Martin*, 803 F.3d at 591–92 (a co-defendant who "was not implicated in any of the transactions for which [the defendant] was held accountable at sentencing . . . . is irrelevant to the inquiry" under Section 3B1.2); *Rodriguez De Varon*, 175 F.3d at 941 ("[W]e have unambiguously held that a defendant's role in the offense may not be determined on the basis of criminal conduct for which the defendant was not held accountable at sentencing.").  Because Jackson was not held accountable for any of the underlying PPP fraud conduct that she asks the Court to consider (both as to John Gaines and others), she has failed to meet her burden of proving that she played a minimal role.

Moreover, each of the factors the Court may consider under Section 3B1.2 shows that Jackson was not a minimal participant in the money laundering offenses.  U.S.S.G. § 3B1.2 cmt. (n.3(C)).

a.  *The degree to which Jackson understood the scope and structure of the criminal activity.*  Jackson understood the scope and structure of the money laundering offenses because she was a direct participant in the money laundering.  She participated in two financial transactions through which she received funds from Gaines Reservation for purposes she knew were false (*i.e.* "fees for consulting fees/daily business management" and "payroll services").  (PSR, ¶¶ 79, 81.)  Moreover, she knew that the purpose of the transactions was to conceal PPP loan proceeds, as the testimony and exhibits at trial established that she knew that John Gaines was involved in fraudulent PPP loan applications in Spring 2020 and had even partially completed a PPP loan application herself.

_____

[2] Andre Gaines was not a participant in the money laundering offenses for which Jackson was held accountable.  He pleaded guilty to lying to the FBI in connection with an interview he gave about Gaines Reservation's PPP loan.

(*Id.*, ¶ 91.)  Her lies to the FBI when interviewed about the transactions also demonstrate her understanding of the scope and structure of the money laundering, as she knew that she had to falsely contend that the funds were for payroll to comply with the PPP rules.  (*Id.* ¶ 88.)  And looking beyond the trial evidence to Jackson's personal history further confirms that she undoubtedly knew full well the scope and structure of the money laundering offenses. Jackson is a "highly educated . . . business professional who has more than 26 years of experience in program management positions."  (DE 987 at 7.)

Jackson addresses only her understanding of the scope and structure of the "overall criminal activity in this case" and the PPP loan application for Gaines Reservation, including the "drafting or preparing" of application materials.  (*Id.* at 15.)  Jackson is not held accountable for any underlying PPP fraud activity, and her analysis is therefore irrelevant.

b.  *The degree to which Jackson participated in planning or organizing the criminal activity.*  The evidence at trial showed that John Gaines planned or organized the laundering of funds to Jackson, and in part for that reason, the United States is arguing for an aggravating role enhancement for John Gaines. That Jackson was not an organizer, however, does not entitle her to a mitigating role adjustment.  *See, e.g., United States v. Rodriguez*, 751 F.3d 1244, 1258 (11th Cir. 2014) ("The fact that the court found that [the defendant] was not a manager or supervisor in the scheme, so as not to warrant an aggravating role enhancement, does not automatically mean that [the defendant] is entitled to a minor role adjustment."); *United States v. Nunez-Sandoval*, 592 F. App'x 842, 845–46 (11th Cir. 2014) ("Simply not being a supervisor or manager does not automatically entitle

a defendant to a minor-role reduction."). Jackson's assertion that she was not
involved in the planning or organization of "the broader conspiracy" involving
PPP fraud, while true, is irrelevant. (*See* DE 987 at 15.)

      c. *The degree to which Jackson exercised decision-making authority or influenced
the exercise of decision-making authority.* Jackson, an educated, professional
woman, alone decided to allow John Gaines to use her bank account to hide
Gaines Reservation's PPP loan proceeds. She made the decision to deposit a
$155,252.50 check for "fees for consulting fees/daily business management,"
even though she knew she was not consulting for Gaines Reservation or
providing daily business management. (*See* PSR, ¶ 79.) She made the decision to
purchase $30,000 in cashier's checks for John Gaines' benefit, despite her
knowledge that the funds in her account were fraudulently obtained PPP funds.
(*Id.*) She made the decision to allow John Gaines to wire transfer another
$179,985.72 into her account for "payroll services," despite knowing that she was
providing no payroll services. (*Id.*, ¶ 81.) Jackson could have decided not to
participate in the money laundering offenses, but she chose to participate and
then to lie to cover up her crimes. Jackson's argument that "[t]here was no
evidence presented at trial" that supports this factor (DE 987 at 15) ignores the
evidence that Jackson was the sole authorized signer on the account and
accordingly, the only person with control over the funds coming into and out of
her account.

      d. *The nature and extent of Jackson's participation in the commission of the
criminal activity, including the acts performed and the responsibility and discretion
Jackson had in performing those acts.* As described above, in (c), Jackson herself

carried out the money laundering activity and alone could have chosen not to do so.  Jackson asserts that "her business bank account for MRS Inc. was used by John and Andre Gaines to transfer money from Gaines Reservation and Travel to MRS Inc.'s bank account."  (DE 987 at 15.)  While she uses the passive voice in an attempt to write herself out of the story, her account was not "used by" others. *She* used her account to enable John Gaines to hide Gaines Reservation's PPP funds.  And her participation in the money laundering offenses was critical to John Gaines's efforts to conceal the fraudulently obtained PPP funds.

  e. *The degree to which Jackson stood to benefit from the criminal activity.*

  Jackson received more than $335,000 into a bank account that she alone controlled, such that she stood to benefit financially from the offenses as she had sole control over the disposition of those funds.  Jackson argues that the amount she stood to benefit is "unclear," in part because the FBI seized the majority of the funds before she could spend them.  (*See* PSR, ¶ 87; DE 987 at 16.)  But the burden of proving a minimal role is on Jackson, and she cannot meet her burden by pointing to "unclear" evidence as to this factor.

  Jackson has not met her burden of proving her mitigating role.

## B. Jackson Attempted to Impede and Obstruct the Investigation by Providing False and Incomplete Information to the Grand Jury.

  A grand jury subpoena served on Jackson for Management Resource asked Management Resource to produce "[a]ll communications with the following individual and/or entities," including Andre Gaines and Gaines Reservation.

(Ex. A at 10.)[3]  In response to that grand jury subpoena, Jackson submitted a letter to the Grand Jury that said that "[i]n-person communications were held with Andre Gaines/Gaines Reservation and Travel LLC."  (*Id.* at 2.)  Jackson did not produce any communications with John Gaines about the payments that Management Resource received from Gaines Reservation.  The evidence at trial, however, proved that (1) Jackson did not have any in-person communications with Andre Gaines, and (2) Jackson communicated with John Gaines about payments from Gaines Reservation, including through text messages that were presented by Jackson at trial but were not provided to the Grand Jury by Jackson. (*See* Trial Ex. J-13.)

A grand jury subpoena was also served on Andre Gaines for Gaines Reservation.  In response, Andre Gaines submitted a letter to the Grand Jury that said that "[c]ommunications were in-person with representatives from Management Resource Services therefore I have no document to produce."  *See* Ex. B at 2.)[4]  The cover letters from Jackson and Andre Gaines were nearly identical, demonstrating that they were written by the same person.  (*Compare* Ex. A at 2, *with* Ex. B at 2.)

Jackson's grand jury subpoena response was an attempt to obstruct or impede the investigation of the money laundering offenses for which she was

---

[3] Exhibit A is an excerpt from Management Resource's grand jury subpoena return.  The United States has omitted the actual return, which contains private information, including tax returns.

[4] Exhibit B is an excerpt from Gaines Reservation's grand jury subpoena return.  The United States has omitted the actual return, which contains private information, including tax returns and bank records.

convicted in several ways: (1) it falsely contended that the payments from Gaines Reservation to Management Resource were the result of arms-length communications between Jackson and Andre Gaines; (2) it concealed John Gaines's role in the money laundering offenses; and (3) it withheld communications between Jackson and John Gaines related to the payments from Gaines Reservation to Management Resource.  Furthermore, there can be no doubt that Jackson acted "willfully" to impede the investigation, as when she was interviewed by the FBI, she did not mention John Gaines to the FBI even once despite the now-known fact that he was central to the matters the FBI asked her about.  *See* U.S.S.G. § 3C1.1.  Jackson's grand jury subpoena response was intentionally designed to prevent law enforcement from learning of Jackson's offenses and of John Gaines's role in them (indeed, John Gaines was not indicted until nearly a year after Jackson).  Thus, an obstruction enhancement should apply under Rule 3C1.1.

Jackson's arguments against an obstruction enhancement are red herrings. *First*, she argues that the United States' request for an obstruction of justice enhancement is premised on Andre Gaines and that the Court should require Andre Gaines to testify before imposing an enhancement.  (DE 987 at 17–18.) Not so.  Jackson's attempts to obstruct and impede the investigation are evident from the face of her letter to the grand jury, the materials omitted from her grand jury subpoena response, and the contrary evidence presented at trial.  While Andre Gaines' declaration establishes that Jackson drafted Management Resource's and Gaines Reservation's letters, Jackson's apparent challenge to that assertion is immaterial because it is evident from the letters themselves that the

same person drafted both letters.  In addition, Jackson produced her grand jury subpoena response from her personal email address and with her signature.  (Ex. C; Ex. A at 2.)  To the extent she did not draft her letter, she still signed and submitted it to the grand jury knowing it contained falsehoods and concealed information and documents.

*Second*, Jackson suggests the information not produced in her grand jury subpoena could be explained by pages "missing" from her response.  (DE 987 at 18–19.)  But the response itself refutes her argument.  The subpoena included production requests A through H, which were included in the copy of the subpoena that Jackson sent to the grand jury.  (Ex. A at 9–10.)  And Jackson's cover letter provided information as to each of those production requests, except that she listed Request G twice (designated as G and H), such that the response to Request H was mislabeled as I.  (Ex. A at 2.)[5]  In other words, the request for communications between Management Resource and Gaines Reservation was included in the materials that Jackson included with her grand jury subpoena response, such that it was not "missing."  And to the extent Jackson is suggesting that she *did* produce her text messages with John Gaines and those were "missing" from her grand jury response, that suggestion is untenable given that she expressly said in her letter that she had communications only with *Andre* Gaines and actively concealed John Gaines' existence from law enforcement when interviewed.

---

[5] Further confirming that Jackson's and Andre Gaines' letters were drafted by the same person, Andre Gaines' letter also mislabeled the requests as A through I rather than A through H.  (*See* Ex. B at 2.)

II.   **A Significant Custodial Sentence is Necessary Under Section 3553(a).**

A within-Guidelines sentence appropriately balances the relevant Section 3553(a) factors.  On the other hand, Jackson's requested sentence of probation asks the Court to impermissibly weigh her history and characteristics to the effective exclusion of all other relevant Section 3553(a) factors, as the Eleventh Circuit cautioned against in *United States v. Howard*, 28 F.4th 180 (11th Cir. 2022).

1.   **The Nature and Circumstances of the Offenses.**

Money laundering is a very serious offense, as reflected by Congress's determination that money laundering is punishable by a sentence of up to twenty years of imprisonment and that engaging in money laundering makes a non-citizen inadmissible to the United States.  18 U.S.C. § 1956(a)(1); 8 U.S.C. § 1182(a)(2)(I).   Jackson's willingness to knowingly launder proceeds of fraud enabled those who committed the underlying fraud to (unsuccessfully) attempt to evade detection and conceal the proceeds from recovery by law enforcement.

Moreover, Jackson's offense occurred during an unprecedented global crisis.  In early 2020, the COVID-19 pandemic sent stock markets crashing and unemployment rates skyrocketing, while nationwide lockdowns ground the economy to a halt.  Many American businesses – and in particular, small businesses – struggled to stay afloat as consumer demand plummeted, creating daunting uncertainty for the businesses, their employees, and the families who rely on them.  Against that backdrop, Congress passed the PPP as one of the mechanisms for providing relief to small businesses and their employees.  While earning a six-figure salary (PSR, ¶ 130; DE 987 at 7) during the early days of the COVID-19 pandemic, Jackson concealed funds that were intended for employees

of struggling businesses.  Finally, when Jackson got caught, she lied to the FBI and attempted to impede the investigation, further compounding the seriousness of her offenses.

Jackson's Memorandum essentially ignores the offenses she committed, instead focusing on conduct she was not charged with and has not been held accountable for.  (*See, e.g.,* DE 987 at 6 ("Ms. Jackson never submitted a loan application for PPP funds and never fraudulently represented to any financial institution that she needed funds for any payroll, or other expenses related to her own business."); *id.* ("Jackson's place in the Government's (Second) Superseding Indictment was very minor compared to other defendants in this case.").)  She then asserts, with no explanation, that "[t]he 'nature of the offense' . . . point[s] to the rendering of a sentence below the recommended guideline range."  (*Id.* at 9.) The nature of the offense does not support a downward variance.  *Howard,* 28 F.4th at 207–08 (in a white-collar case, reversing as substantively unreasonable a probation sentence that "[did] not reflect the seriousness of the offense").

### 2.     Jackson's History and Characteristics.

Jackson's Memorandum focuses heavily on her history and characteristics, highlighting that she "is not a prototypical defendant" because (1) she is highly educated and an experienced professional; (2) at the time of the offenses, she was employed in a six-figure job and did not need more money; (3) she is a victim of John Gaines's lying and cheating; (4) she has tremendous community support, as demonstrated by 40 letters submitted on her behalf; (5) she has no history of crime, violence, or substance abuse; (6) she is 56 and therefore at "an extremely low risk for recidivism"; and (7) she faces collateral consequences to her life and

career because of her felony conviction.  (DE 987 at 7–9, 12 & n.7.)   While a defendant's history and characteristics "is an important factor in sentencing," it "should not be the single-minded focus to the detriment of all other factors." *Howard*, 28 F.4th at 218.

In fact, in white collar cases, the Eleventh Circuit regularly reverses overly lenient sentences like the one Jackson requests here.  *See Howard*, 28 F.4th at 218–20 (reversing sentence of probation with home detention where the district court improperly considered the defendant's history and characteristics to the exclusion of other significant factors that weighed in favor of imprisonment); *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) (reversing sentence of probation because the sentence did not reflect the seriousness of the crime, promote respect for the law, provide just punishment, or adequately deter others); *United States v. Crisp*, 454 F.3d 1285, 1291 (11th Cir. 2006) (reversing sentence of five hours of imprisonment because the district court unjustifiably relied on the defendant's restitution obligation to the exclusion of other factors); *United States v. Livesay*, 587 F.3d 1274, 1277–79 (11th Cir. 2009) (reversing probationary sentence because "a sentence devoid of any meaningful period of incarceration simply does not reflect the[] goals" in Section 3553(a)(2)).

Here, Jackson's history and characteristics do not warrant a downward variance, let alone the significant downward variance she requests.  *First*, Jackson's educational background and professional background – as well as any collateral consequences to her career – do not weigh in favor of a downward variance.  If anything, they weigh *against* a downward variance.  In *Howard*, the district court sentenced the defendant to probation with home detention, in part

-13-

because the defendant would lose her medical license, which the district court viewed as a collateral consequence of the conviction that would sufficiently punish the defendant. *Howard*, 28 F.4th at 210. The Eleventh Circuit explained that consideration of such a factor unfairly benefits defendants of higher socio-economic standing:

> One concern that arises from discounting the need for (or length of) a prison term when the defendant loses a professional license upon conviction is that the only defendants who benefit from a lesser sentence on that ground are those who have a professional license to lose. And there is some correlation between professional licenses and socio-economic standing, which poses the risk of building in lower sentences for those in higher socioeconomic groups. That would not be a good revision of the Guidelines.

*Id.*; *see also Kuhlman*, 711 F.3d at 1329 (probationary sentences "are typically unavailable to defendants of lesser means who are convicted of economic crimes"). Indeed, the Eleventh Circuit encouraged district courts to "keep in mind that criminals who have the education and training that enables people to make a decent living without resorting to crime are *more rather than less culpable* than their desperately poor and deprived brethren in crime." *Howard*, 28 F.4th at 210 (emphasis added) (citation, quotation marks, and alterations omitted).

Here, while Jackson has not argued that she will lose a professional license, the collateral consequences she invokes are similar to the medical license at issue in *Howard*. That is, Jackson had a successful career to lose, but granting her a downward variance because she may lose her career would mean that a poor, uneducated defendant without a successful career who committed the same offenses as Jackson would not be entitled to a downward variance because the collateral consequences to that defendant would not be as significant. As the

Eleventh Circuit recognized, however, Jackson's education and successful career make her more culpable, not less culpable. She had the education, knowledge, experience, and financial resources to say "no" to committing the offenses, but instead she chose to participate in them.[6]

*Second*, Jackson's lack of criminal history and low risk of recidivism do not support a downward variance because her Guidelines range already accounts for her lack of criminal history and low risk of recidivism. *See Howard*, 28 F.4th at 223 ("[The defendant's] lack of criminal history had already been factored into her criminal history score, which resulted in a lower guidelines range than if she had a criminal history."); *United States v. Martin*, 455 F.3d 1227, 1239 (11th Cir. 2006) ("While the district court emphasized [the defendant's] lack of a criminal record and viewed his fraudulent conduct as an 'aberration' in his otherwise outstanding life, [the defendant's] criminal history category of I already takes into account his lack of a criminal record."). This is even more true after the enactment of Section 4C1.1. *See* U.S. Sentencing Commission, Amendment 821, available online at: https://www.ussc.gov/guidelines/amendment/821 (explaining that the two-level reduction under Section 4C1.1 was informed by recidivism studies showing that offenders with zero criminal history points have "considerably lower recidivism rates" than others).

---

[6] *Howard* also held that convicted felon status "is not a proper basis for varying upward or downward from the guidelines range" because that is "[a] factor that exists in more than nineteen out of twenty cases" and "is just an expected, ordinary, everyday fact of life for defendants sentenced under the guidelines." *Howard*, 28 F.4th at 215.

*Third*, that Jackson would likely not have committed the offenses if John Gaines had not presented her with an opportunity to do so does not warrant a variance. *See Howard*, 28 F.4th at 215 (district court erred in considering the "improper factor" that the defendant was given the opportunity to commit a crime by a co-defendant who preyed on her financial need).

*Fourth*, Jackson's community support, while extraordinary, does not weigh in favor of the lenient sentence she requests when considered in conjunction with the remaining Section 3553(a) factors. The Eleventh Circuit has explained that a defendant's "history cannot be considered in isolation and without regard to the criminal conduct for which [she] has been convicted and the characteristics it reveals." *Howard*, 28 F.4th at 219. Thus, while a district court is "correct to consider" letters from a defendant's supporters, it should not "allow[] those reports about [a defendant's] non-criminal history and deeds to outweigh [other] factors that strongly favor[] a greater than mere probation sentence." *Id*. at 220–23. In *Howard,* the district court imposed a probation sentence based primarily on "more than 50 letters addressed to the judge from relatives, friends, colleagues, and acquaintances [of the defendant] who attested to her good personal history, kind acts, and many virtues." *Id*. at 202. The Eleventh Circuit reversed the sentence of probation, concluding that "[i]t was not reasonable to give [the defendant's] history and characteristics so much emphasis that the factor outweighed all of the factors strongly indicating that some imprisonment was needed to serve the goals of sentencing." *Id*. at 223. Jackson's letters of support should be considered, but they do not outweigh the other Section 3553(a) factors that support a significant term of imprisonment.

Importantly, Jackson's Memorandum fails to acknowledge an important aspect of her history and characteristics: her lack of remorse and failure to accept responsibility. The Eleventh Circuit has recognized that most white-collar criminals are "genuinely remorseful." *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014). Jackson is not. Rather, she continues to blame others and appears to take no responsibility for her offenses. She blames John Gaines and asserts that she "now suffers the legal consequences of that tragic relationship in this case." (DE 987 at 8.) But Jackson is not a victim; the jury found beyond a reasonable doubt that she knowingly laundered fraudulently obtained PPP loan proceeds. Jackson also ignores that at the time she committed the offenses, she was already divorced from John Gaines after discovering that he was untrustworthy, such that she was not led astray by a person she trusted and was in an intimate relationship with. And while Jackson characterizes John Gaines as "integral to the Government's case against" her (DE 987 at 8), it was *Jackson*, not the United States, who called John Gaines to testify, hoping that he would falsely exculpate her.

Jackson also appears to blame Congress and the lender that approved Gaines Reservation's fraudulent PPP loan. She contends that the PPP was "poorly established (and regulated)" and that it was "woefully inadequate to spot fraudulent applications." (DE 987 at 11.) As Kandace Zelaya explained at trial, the PPP was purposefully designed to get money to struggling small businesses as quickly as possible during a national crisis, and therefore, the PPP relied on applicants to tell the truth rather than requiring lengthy due diligence

processes that would delay funding.  Jackson's attempts to malign the United States' generosity in the PPP underscores her lack of remorse.

Jackson's failure to accept responsibility weighs against a sentence of probation and in favor of a sentence of imprisonment.  *Howard*, 28 F.4th at 219 ("Because she refused to accept responsibility or cooperate, [the defendant's] sentence of probation is even more unreasonable than the probation sentences we vacated in [other] white collar crime cases" where "the defendants did accept responsibility and rendered substantial assistance to the government"); *see also United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011) ("[The defendant's] failure to accept responsibility was an appropriate consideration in the determination of his sentence.").

When considered in conjunction with the other Section 3553(a) factors – in particular, the nature and circumstances of the offense and the need to provide just punishment and afford adequate deterrence – Jackson's history and characteristics do not support a non-Guidelines sentence.

### 3.    The Need for Adequate Deterrence.

A probationary sentence would not serve the important goals of general deterrence and specific deterrence.  "General deterrence is more apt, not less apt, in white collar crime cases." *Howard*, 28 F.4th at 209.  To be sure, "[l]eniency undermines general deterrence, and the extreme leniency of a probation sentence undermines it extremely.  It sends the wrong message and sends it loudly and clearly." *Id.* at 209; *see also Livesay*, 587 F.3d at 1279 ("[T]he threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a

meaningful period of time."); *United States v. McQueen*, 727 F.3d 1144, 1158 (11th Cir. 2013) (recognizing that general deterrence is one of the "'key purposes of sentencing'") (citation omitted).  A significant sentence is needed to deter people from engaging in money laundering offenses that facilitate the concealment of fraud offenses.

Jackson's analysis of deterrence is inapt for several reasons.  As an initial matter, she addresses the need to deter PPP fraud, but her offenses were money laundering offenses, not PPP fraud offenses.  Her arguments as to the need to deter PPP fraud are therefore misplaced.  Moreover, the Eleventh Circuit has rejected arguments like those Jackson raises as to PPP fraud.  Specifically, she asserts that "[t]he continuing need for 'general deterrence' in the PPP loan landscape has changed, fundamentally."  (DE 987 at 11–12.)  But the Eleventh Circuit has recognized that deterrence is no less important when "there is no longer an opportunity (or as much opportunity) to commit the specific type of fraud [the defendant] committed."  *United States v. Oudomsine*, 57 F.4th 1262, 1267–68 (11th Cir. 2023) ("The deterrence effect of the sentence in a fraud or theft case involving a specific government program extends beyond commission of the same type of crime against the same program.").  And her suggestion that the PPP's design somehow undermines the need for deterrence is nothing more than an attempt to blame the victim rather than the fraudster.  (DE 987 at 10 (arguing that it is "paradoxical" for the United States to argue a need for general deterrence given that the PPP had "weak financial controls")); *Kuhlman*, 711 F.3d at 1328 (in a healthcare fraud case, explaining that because "[i]nsurance companies must rely on the honesty and integrity of medical practitioners,"

when a defendant is convicted of healthcare fraud, "one of the primary objectives of the sentence is to send a message other health care providers that billing fraud is a serious crime that carries with it a correspondingly serious punishment").

Specific deterrence also plays a role here, though a lesser one than general deterrence. Unlike many of the other defendants in this case who came clean when confronted by the FBI and/or accepted responsibility after being charged, Jackson has done the opposite. When she was interviewed by the FBI, she lied and covered up her offenses. When she responded to the grand jury on behalf of Management Resource, she attempted to impede and obstruct the investigation. And even after a lengthy trial in which a jury convicted her, she refuses to acknowledge any wrongdoing. Because of this, the United States sees a need to ensure that Jackson does not engage in this type of conduct again.

The need for deterrence requires a significant sentence of imprisonment. A sentence of probation would constitute a "soft pat" on Jackson's wrist and do little to dissuade her or others from engaging in money laundering in the future. *Kuhlman*, 711 F.3d at 1328. Indeed, a sentence of probation would encourage would-be white-collar offenders to view probation as part of the cost of doing business. Nor would a lenient sentence reflect the seriousness of laundering more than $335,000 of fraudulently obtained funds intended for struggling small businesses and their employees in the midst of a global crisis. *Hayes*, 762 F.3d at 1308 (collecting cases where the Eleventh Circuit has "set aside sentences of little to no imprisonment" in white collar cases "because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar activity by others").

4.      **Unwarranted Sentencing Disparities.**

To date, the Court has sentenced 20 individuals in connection with Darrell Thomas's PPP loan fraud scheme, 19 of whom pleaded guilty to a bank fraud, wire fraud, and/or money laundering offense.[7]  Jackson is not similarly situated to the other defendants because she is the only person who was involved in laundering fraudulently obtained PPP loan proceeds but not in the underlying criminal activity.  Still, it bears noting that only one of the other defendants received a sentence of probation, which the Court imposed because of that defendant's rare medical condition that rendered a prison environment life-threatening.  It is also worth noting that nearly all other defendants convicted in this case accepted responsibility for their offenses, and some cooperated with the United States, while Jackson still has not accepted responsibility or shown any remorse.  To the extent Jackson is similarly situated to other defendants convicted in this case, a non-custodial sentence would create unwarranted sentencing disparities.

**III.  <u>The Court Cannot Offset Jackson's Restitution Obligation.</u>**

After the final PSR was issued, Jackson notified the Court via email of a new objection: she contends that the restitution amount she owes should be offset or reduced by the amount seized by the United States from her account.  Her argument is foreclosed by both the plain language of the Mandatory Victim Restitution Act of 1996 (the "MVRA") and binding Eleventh Circuit precedent.

---

[7] Andre Gaines, who was sentenced to five years' probation, pleaded guilty to making false statements to law enforcement.

The MVRA applies to convictions for any offense "in which an identifiable victim . . . has suffered . . . pecuniary loss."  18 U.S.C. § 3663A(a)(1), (c)(1)(B).  In such a case, a district court "shall order restitution to each victim in the *full amount of each victim's losses* as determined by the court and without consideration of the economic circumstances of the defendant."  18 U.S.C. § 3664(f)(1)(A) (emphasis added).  Moreover, "[i]n no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance *or any other source* be considered in determining the amount of restitution."  18 U.S.C. § 3664(f)(1)(B) (emphasis added).  "In addition to the restitution mandated by the MVRA, federal law also requires a district court to order the forfeiture of any property traceable to certain criminal offenses."  *United States v. Joseph*, 743 F.3d 1350, 1354 (11th Cir. 2014).

In *Joseph*, the Eleventh Circuit held "that a district court generally has no authority to offset a defendant's restitution obligation by the value of forfeited property held by the government."  *Joseph*, 743 F.3d at 1354–55 (explaining that its holding is consistent with the approach taken by five other circuits).   This is because restitution and forfeiture serve "distinct purposes": restitution "seeks to make victims whole by reimbursing them for their losses," while "forfeiture is meant to punish the defendant by transferring his ill-gotten gains to the United States Department of Justice."  *Id.* at 1354.  Indeed, "the MVRA expressly requires a district court to order restitution in the full amount of a victim's losses and specifically prohibits the court from reducing that amount by the value of any other compensation received by the victim before entry of the restitution order."  *Id.* at 1355.  Instead, the "Attorney General alone has discretion to

determine whether to retain forfeited property or apply it toward the restitution owed to the victims of a defendant's offense." *Id.*

Under *Joseph*, the Court "ha[s] no authority to offset [Jackson's] restitution obligation by the amount of funds forfeited to the government." *Joseph*, 743 F.3d at 1356. The Court should accordingly reject Jackson's request to the contrary.

## <u>Conclusion</u>

For these reasons, and further arguments the United States will present at the sentencing hearing, the United States respectfully requests that the Court deny Defendant's request for a downward variance and impose a within-Guidelines sentence.

Dated: May 8, 2024.

RYAN K. BUCHANAN
*United States Attorney*

*Tal Chaiken*

TAL C. CHAIKEN
*Assistant United States Attorney*
Georgia Bar No. 273949

SAMIR KAUSHAL
*Assistant United States Attorney*
Georgia Bar No. 935285

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

GLENN S. LEON
*Chief, Fraud Section*
*U.S. Department of Justice*

SIJI MOORE
*Trial Attorney, Fraud Section*
*U.S. Department of Justice*

1400 New York Ave, NW
Bond Building, 11th Floor
Washington, DC 20005
202-514-2000; Fax: 202-514-3708